Mr. Hatch-Stetler, please proceed. It was obvious to lower the dose of the testosterone drug in an overdose of patients in three published clinical studies. That, in essence, is our argument. There was no dispute that the drug used in the clinical studies was the composition recited in the asserted claims. The district court clearly erred in failing to find from the stipulated fact that the articles that describe the clinical studies also inherently described the recited composition. But the testimony in this case was that any of a large number of co-solvents could have been used and that the ratios could have been different. It turns out that what they actually used in those studies did correspond to the claims, but that's not what the references disclose and quite frankly, nor do they inherently disclose that under our law of inherency. Your Honor, I don't agree. The fact that there is no dispute that the composition was in fact used. That doesn't mean it's inherently disclosed. I don't understand how you want to mess up the law of anticipation and inherency. It's a straightforward, it's never been articulated any differently than the document necessarily includes that. And in this case, you can't say this document necessarily includes it. It turns out that study did in fact include it, but the testimony of record was that any number, I believe it's five different co-solvents, would have worked and different ratios would have worked and all the experts agreed on that. So I don't understand how we would mess up the law of inherency, which is what you're asking us to do, by concluding that even though the document doesn't necessarily result in someone understanding that this is what was used, it should nonetheless be deemed to be inherently disclosed. Your Honor, I don't believe anywhere in the record does it say that another combination would have obtained exactly the same combination of pharmacokinetic profile and the results. The testimony was that there were other other solvents that could be used, but in this case though, the people of skill today recognize that what was used in those studies was in fact, was Custofarm's expert conceded Oposa would not know that the prior art necessarily used a formula of 40% castor oil and 60% benzobenzoate, and that is pointing to the expert testimony at A404. So in addition to the fact that there were at least five co-solvents that could have been used, of which only one was benzobenzoate, they've got evidence they point to that would That goes to the recognition requirement, and there is no requirement that persons of ordinary skill recognized at the time what the composition was, and that testimony, I believe, was directed to that. Okay, so let me see if I can understand. There might be two strains of inherency that we're discussing right now. One is the one that I understand that Judge Moore is questioning you about, which is when someone's reading those articles, a person of ordinary skill in the art, even though the articles don't expressly say benzobenzoate and a ratio of 40 to 60 between castor oil and benzobenzoate, nevertheless a person of skill would necessarily understand while reading that reference in context, aha, there's definitely benzobenzoate in here and it's at a 40 to 60 ratio, and that strain of inherency, you agree, is not what you're advancing. Is that fair to say? It's a different strain, which is that the actual formulation that was being used by those authors in those articles was necessarily the very formulation that's being recited in these claims, and so even though could not be appreciated by a person of ordinary skill in the art reading those articles at the time, they were somehow inherently a necessary characteristic of the formulation that was being reported on in those articles. Is that your theme of your inherency argument? As I understand it, your honor, those two inherency themes, as you put it, actually come together. In Continental Can... But before you tell me what Continental Can is, I want you to tell me what your particular theory of inherency is. Did I get it right or did I get it slightly wrong, your honor? Okay. Inherency does require a person of ordinary skill to recognize that the disclosure necessarily encompassed the invention. However, in the Shearing case, established that that recognition does not have to occur during the prior art period. Today, a person of ordinary skill reading the articles knows that the composition is the recited composition. So those two issues, as we see it, come together, and the key is that the recognition of the necessary result does not have to occur during the prior art period. But I guess the concern I have about your argument is that what was disclosed in those articles was an incomplete disclosure of what that formulation was. It gave you some of the ingredients, but it didn't give you all the ingredients. It's almost like the article had said, we have this interesting new formulation for administering testosterone, and we come up with this really special vehicle for administering it, but I'm not going to tell you what my secret vehicle is. And now I'm just going to report out the Do you think that would put the invented vehicle in the possession of the public once an article like that was published? It would put it into the possession of the public once the public recognized the inherent disclosure. This court, I believe, has rejected on several occasions the idea that the recognition had to occur during the prior art period. I guess I'm worried that if there is some kind of formulation with five ingredients, but let's say the author only chooses to identify one of the five ingredients and says, I'm not going to tell you the other four, and no one reading the article would be able to figure out what those other four are, I don't know if we can say that that five-ingredient formulation was actually disclosed and taught in that prior art reference. And to let me follow up on Judge Chen's hypothetical, because I think it's very useful, your argument is effectively when 20 years later the formula for Coke does get known, it's obvious based on this article even though it wasn't disclosed and it's obvious as of that date earlier even though people didn't know it. That's your problem. Your problem isn't that you want to use the information once it became known as of the date it became known. You want to use the information and give it the date of the articles for prior art purposes for obviousness. What we want to say is that a publication is a dedication to the public of all that's contained therein, and if the public learns later something new about that disclosure, that information is not taken away. But it wasn't contained therein. That's your problem. The information wasn't contained therein. The public didn't become in possession of that information until later in time. And it doesn't necessarily get contained therein. So the kinds of cases you're talking about where it's even if the public doesn't know about it, is where there is a natural physiological response that will always happen to a particular drug. It may be people didn't know about it at the time, but it always happens. So once we learn that it always happens, that disclosure necessarily included it because nothing else could have resulted in that. But here any number of different co-solvents could have resulted in what the article reported. We just found out later what they actually used, but any number of them could have. It's not necessarily the case that it had to be these. Now if you pointed out in our blue brief in the prior art reference didn't necessarily result in the claim to venture. It depended on how you practiced it. And there was no recognition of that. And so the logic of those cases, we submit actually counsels in favor of saying that when it's here there's no question that in fact what is disclosed in the articles was the presided composition, then the public is in possession of that information. And if they learn more about it later, then the public's entitled. But I guess you would agree that at the time those articles were published, there was not enough information in those articles for someone else, a person of skill in the art, to go out and make and use that formulation. Is that fair to say? No, I wouldn't agree that it had to make and use a formulation. They would not, however, have known. I'm sorry, did you agree or disagree with me? At the time of those articles publication, a person of skill in the art would not be able to make and use the claim formulation in the sense that they would know, aha, I'm going to use benzyl benzoate, I'm going to use a ratio of castor oil to benzyl benzoate of 40 to 60. The testimony was that a person of ordinary skill would not have known immediately what the combination was. It would have been a matter of routine experimentation to get to the 40-60 combination because it was a commercial product. I see you're into my rebuttal time. Okay, let's save your rebuttal time. Mr. Gewertz on behalf of Bayer and Indo Pharmaceuticals. The patents at issue claim a novel dose regimen and formulation of testosterone and undecanoate that work in combination to provide long-acting serum testosterone levels in a broad population of hypogonadal men. The prior art does not contain the claim 750 milligram dose, the claim four week followed by a 60% castor oil, 60% benzyl benzoate formulation, let alone any of the three in combination with one another. Tell us what your views are on the inherency question that you're discussing with your opposing counsel. Absolutely, and I think actually, Your Honor, Judge Chen's hypothetical that he posed to my friend is fitting and was one that was similarly used at the trial court level, and I'd like to elaborate and give an example. If the prior art included a letter for, hypothetically, from Dean Kamen that said, I'm about to come out with an invention that has a handlebar, two wheels, and goes really fast, and then subsequently claimed in a subsequent patent the segue, that prior art would not inherently anticipate the segue because it allows for both a bicycle to be described and a segue. And the same issue is here, where the prior art describes the formulation as, and I would just quote, 250 milligrams testosterone undecanoate dissolved in one milliliter castor oil, and that's at appendix 1125. That description, that teaching in the prior art, allows for any number of formulations that contain benzyl benzoate or other co-solvents at various different ratios. So to the segue example where the prior art describes a possibility. This court's cases specifically state, and I would quote from Henri Ricard, that what may be present is not necessarily known, and obviousness cannot be predicated on what may not necessarily be known. But it is true that the formulation that was being discussed by the authors of those articles, it was in fact, it did have benzyl benzoate in the 40-60 ratio. Is that fair to say? Yes. So in that sense, we could say that an inherent characteristic of the composition being discussed in those articles were those particular features. And so what I'm wondering is, there are cases of our where there's, in the prior art, a disclosed gene, and then later on someone else goes through all the effort and work of discovering an inherent characteristic of that gene, the promoter region. And then we said, well, nobody knew about the details of that promoter region, nevertheless it was an inherent characteristic of that prior art structure. So then therefore, it's just, there's no patentability here. And so that's the struggle here in trying to understand how this fits within that kind of case law. Absolutely, Your Honor, and if you'll allow me, I think both the Henri Crich and the Atlas Powder Clases are sort of prescient on this point. As you noted, in Crich it was the promoter region of the human embolicron gene, and in Atlas Powder, the inherent characteristic, as you put it, was the presence of interstitial air in the ammonium nitrate. And in Atlas Powder, we had a formulation in the prior art containing ammonium nitrate and fuel oil, and what was that issue there is the inherency of air within ammonium nitrate itself, such as here, if the claim in the evidence at trial was that castor oil necessarily, 100% of the time, had 1% water content, that would be inherent. But that's not what the claims in these patents state. We're talking about benzoyl benzoate, a second ingredient in the formulation, and the testimony at trial was that the person of skill would have a choice among... Are you going to get to the facts of Crich pretty soon? Sure, Crich dealing with the promoter region in the human embolicron gene, that promoter region is present, the DNA sequence to that region is present 100% of the time. In the prior art, the gene itself was in the prior art, the record demonstrated the size of the promoter region and the plasmid of origin, and this court in that case said, even understanding that other practitioners, other skilled artisans, had tried to sequence it and come up with a different event, we know that the promoter region in Crich, 100% of the time, has that proven true, that practicing the prior art 100% of the time yields a 40% castor oil, 60% benzoyl benzoate ratio. In fact, the only evidence that Custofarm has put forward in the trial court level of that inherency was a stipulation that as of 2007, four years after the critical date, that in fact the ratio had that particular formulation. I think another way to consider this problem is the idea of whether or not the use of this particular formulation in the prior art was invalidating is tantamount to a public use argument. That argument was not made at the trial court level and in any event would not be relevant here because the particular clinical studies at issue. Do we have a different legal standard for understanding public use and on sale bar compared to what needs to be disclosed in a prior art reference for purposes of 102 and let me explain what I'm getting at. It seems like our law on public use and on sale bar, as long as the product is in use or on sale, you don't have to disclose all the little details of that product and it'll still be an invalidating act. Whereas for prior art references, we don't seem to have that kind of a flexible standard. We require every itty-bitty claim element to actually be disclosed or necessarily be inherently disclosed in some way. Do you understand the question I'm getting at? I'll try, if you will, but as I the 102 doctrines of this court and 103. The obvious misanalysis here relying on the teaching of the prior art and what a person of skill would understand. I'm talking about prior art publications versus public use acts and in the inherent both part of section 102 and yet for prior art references I take it you're advancing the idea that even if the product is being discussed and need to actually describe all the claim elements for it to be an invalidating reference unlike the public use. Or that those claim elements would be necessarily present a hundred percent of the time. I think if you look at the inherency cases of this court there is this idea of if practicing the prior art would necessarily being practicing the subsequent claimed invention and that's where I think you get some of the marriage between the doctrines that you see but in this case the actual testimony the record evidence upon which the district court made its factual findings is that there were possibilities to practice the prior practice that 250 milligrams TU in castor oil that could be practiced a number of different ways with a number of different co-solvents at a number of different ratios and it is that nature of the practice of the prior art including many different formulations other than those claimed that is why the inherency doctrine has no place in this case. Apart from the inherency doctrine I don't understand the fact-finding that it would not have been obvious or there wouldn't have been a motivation to lower the testosterone from 1,000 milligrams to 750 milligrams in light of the evidence of record that studies done with a thousand milligrams showed that subjects were above what the ACEE rated as healthy and normal in light of the dosage. Did I get all those facts right by the way? I'll slightly alter some of those facts which is first that the three prior art studies showed mean serum testosterone level the mean serum testosterone level in each of the three studies after the initial dose at a thousand milligrams is within both the AACE guidelines as well as all other normal guidelines. Well the mean but that's the mean I mean there were some subjects in the study that were above the healthy dose guidelines. There was in the prior art itself there is only a record of a single anomaly subject at 40.8 serum testosterone level after the first dose. The other evidence is not in the prior art and if you look at footnote 20 of the district court's opinion the court notes that that evidence is not in the prior art and there is also testimony at the trial court level that such a level slightly above the normal range would not cause a concern for a clinician because the prior testosterone treatments that were in the prior art these are other testosterone esters were it was common for testosterone serum testosterone levels to fluctuate several fold greater than the normal range. This is appendix 1161 and the district court finding at appendix 32 regards that this would not cause a concern to a clinician. Moreover we look at the conclusions of the prior articles themselves which do not address any sort of safety concern and do not suggest any overdose. In fact they suggest the contrary and state at appendix 1129 that the serum testosterone levels does not result in supernormal serum testosterone levels above the normal range and inherent in the overdose theory that is being put forward is as the district court notes the idea of the AACE guidelines. The evidence at trial is that the AACE guidelines were one of many different normal ranges that were present at the time. Custafarm's own expert admitted in a book that was of all the guideline ranges and the normal ranges at the time the 10 to 35 nanomole per liter range was the most common used by clinicians and it is within that range that you said that there was only I want to make sure understand the facts right only one subject who was above is it the ACE 10 to 30 range is early one subject above that range the the both normal ranges AACE I'm not sure which one it is but in the very article which starts at appendix 1125 there is the mention of a single outlier patient in the yes go ahead and it is above both the AACE guidelines as well as what would have been the other normal ranges including those are there other patients who are not in the prior art unless you extrapolate from standard deviations meaning that if you take two standard deviations away from the mean you could extrapolate that there might be but there is no evidence in the prior art itself other than for that one patient other individuals who are actually outside of the prior art range what about proletar why that was a known vehicle of administering a drug so why not use testosterone with any known vehicle and proletar is one of them and your honor we don't dispute that proletar may have been one of the sort of things on the toolshed of the inventor but the point here is that whether or not the district court's finding that there would be no motivation to use the formulation of proletar given that it was a short-acting injectable was not a formulation with a testosterone ester or testosterone of any type that the the person of skill would not be motivated to combine proletar which is in the reference with the other prior articles when in fact there were other prior art articles that included both testosterone esters in castor oil and those articles show that the amount of castor oil was greater than 60% in order to achieve the potential long-acting objective that was put forward in these patents and those can be found at appendix 1154 1622 and 1637 that's the humboldt the 791 patent reference and European patent reference 794 those are the examples of formulations with castor oil and other testosterone esters with a different formulation than that claimed did judge Robinson point to those they are they are indirectly referenced because she references the testimony about those in the in the record anything further no you're out of thank you for okay we've some rebuttal time thank you judge Henry Krish is is the case that we contend supports our adherency a position in in rate Krish the prior did not know what the promoter sequence was and and in a prior art attempt to sequence it failed so the it did not necessarily result the sequence didn't necessarily result from the practice of the prior art and yet this court still found found adherency but the judge wanted a CE was one of two standards it was the expert standard but it was the less common standard weren't multiple there were two and and in both bear up and in each log there were patients who were overdosed by by the a CE standards with respect to pollutant Depot the motivation as we explained in our briefs to use that was separate apart from whether or not you were looking for a long-acting injectable the it was also desirable to have a concentrated steroid injectable drug and Pruitt Depot was the only 250 milligram per milliliter injectable drug on the market it was desirable to use a commercial product because you had no FDA issues and that would have been a separate motivation to try the the pollutant Depot and we know it would have worked because the claimed invention the composition is simply testosterone and decanoate substituted for the exact same for the exact same vehicle but opposing counsel use an example that didn't quite follow but he that he thought would be an example of inheritance but an atlas powder if we follow that it was it would have been that inherently yeah castor oil could have anywhere from one to ten percent water and an atlas powder the fact that one of those ranges in fact would produce the claimed invention was found to make it make it inherent those are the only points I had in rebuttal this okay great thank both counsel for their argument the case is taken under submission